# EXHIBIT 1-c

# STATE OF MICHIGAN

## MUSKEGON COUNTY CIRCUIT COURT

BRENDA BILLINGS -CARTER,
as Personal Representative of
the estate of Ann Billings, deceased,

           Plaintiff,

vs.

MUSKEGON FAMILY CARE, P.C., and
WILLIAM A. CLARK, PA-C.
jointly and severally,

           Defendants.

_____/

B. Elliot Grysen  (P39997)
Grysen & Associates
Counsel for Plaintiff
806 River Street
Spring Lake, Michigan  49456
(616) 847-2121

_____/

**THIS CASE ASSIGNED TO JUDGE JAMES M. GRAVES, JR.**

HON.

CASE NO. 10-47246 -NH

**COMPLAINT, JURY DEMAND,**
**AND AFFIDAVITS OF MERIT**

NANCY A. WATERS
MUSKEGON COUNTY CLERK
FILED
2010 MAY -3 P 2: 20

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a Judge.

B. Elliot Grysen (P-39997)

1

## FACTS

6.     Prior to December of 2005, Ann Billings was a 36 year old working single Mother, with three children including two minor children.

7.     On or about November 30, 2004, Ann Billings presented to Defendant Clark at Defendant Family Care for an annual health maintenance exam. She was diagnosed with a conjunctival hemorrhage of her left eye, hypertension, and a variety of tests and services were provided.

8.     On or about December 16, 2004, Ann Billings presented to Defendant Clark at Defendant Family Care with complaints of cough which had been occurring in an intermittent pattern for 2 days. She was diagnosed with an acute upper respiratory infection of unspecified site and placed on several medications with a follow up visit in two weeks. Defendant Clark also prescribed an electrocardiogram at this time.

9.     On or about January 12, 2005, Ann Billings presented to Defendant Clark at Defendant Family Care  with complaints of chest pains  that had been occurring for over a day. Defendant Clark prescribed Ranitidine HCl. She was also advised to take Tylenol at home for the chest wall pain and add Zantac for probable mild reflux. She was told to return if symptoms worsened.

10.     On or about February 28, 2005, Ann Billings presented to Nicole Bradford, PA-C at Defendant Family Care for a follow up visit for hypertension after presenting to the ER on February 26, 2005 for elevated blood pressure. She was advised to continue taking her blood pressure medication. Also, Promethazine-DM was prescribed for congestion with a follow up in two months for recheck of blood pressure.

11.     On or about May 13, 2005, Ann Billings presented to Defendant Clark for a follow up visit for hypertension and relayed to Defendant Clark that she has some dizziness due to the Sular and was advised to go back to a regular dose. She also relayed some malaise and fatigue. Laboratory work up was ordered with a 3 week follow up.

12.　On or about May 25, 2005, Ann Billings presented to Defendant Clark for a follow up visit for hypertension. She complained of being tired all of the time. Defendant Clark diagnosed hypertension and ordered a hemoglobin test and 2 week follow up.

13.　On or about June 30, 2005, Ann Billings presented to Defendant Clark with complaints of constipation. Defendant Clark diagnosed abdominal pain and constipation and prescribed Colace with a follow up visit in one month. She was also told to consider further GI work up if problems continued.

14.　On or about October 4, 2005, Ann Billings presented to Defendant Clark for a check up. Defendant Clark diagnosed hypertension and chest pain and ordered a doppler Echocardiogram of the heart, holter monitor 24 hours, laboratory work up, comprehensive metabolic panel, TSH, Lipid panel, magnesium, and to follow up after results are back. The echocardiogram and holter monitor were done on October 21, 2005. The abnormal results were received by Defendant Clark. The echocardiogram revealed a mildly dilated, hypokinetic left ventricle with an ejection fraction of 35-40%, and moderate diastolic dysfunction consistent with systolic dysfunction. The holter monitor results revealed:

> The patient was monitored for 24 hours showing an average heart rate of 84, minimum heart rate of 54, and maximal heart rate of 150. Frequent ventricular ectopic beats are noted with computer analysis counting 17,188. This includes 14 runs, as well as frequent triplets and couplets and episodes of bigeminy and trigeminy. The longest run recorded at 10:44 p.m. is consisting of seven beats with a rate of 214. Computer analysis counts 26 supraventricular ectopic beats. This includes a run of three beats at 2:13 p.m. with a rate of 124. No diary is present for an evaluation and therefore no information is known as to the symptoms corresponding to the above noted ectopy.

15.　On or about November 8, 2005, Ann Billings presented to Defendant Clark complaints of coughing up yellow phlegm. She was found to have an acute upper respiratory infections. In regards to her cardiovascular system. It was stated in Defendant Clark's report that she had an S2 physiologic splitting. Murmur 1 - pulmonic area. Early systolic. Grade - II/VI.

4

16.     On December 2, 2005, Ann Billings collapsed and was found unresponsive. After 911 was called, the EMS arrived and took her to Hackley Hospital where she was pronounced dead.  The Death Certificate reveals Cause of Death "Pending - Ventricular Arrhythmia" and Amended 2/1/2006 with "significant condition contributing to death Hypertension".   An autopsy was done and filed on or about January 30, 2006 which revealed no sign of external trauma, no visible lethal natural disease, negative for screened drugs except atropine and caffeine, with the final cause of death being sudden cardiac death due to primary cardiac arrhythmia.

## COUNT I

## WILLIAM CLARK, P.A.-C,, AND
## MUSKEGON FAMILY CARE, P.C.

17.     Plaintiff adopts by reference paragraphs 1 through 16 inclusive.

18.     During the dates described, Defendant Clark represented himself as competent and skilled in the treatment of human ailments, diseases, and injuries.

19.     In particular, by practicing as a PA, Defendant Clark represented himself as competent and skilled in care of adults and medical illnesses.

20.     In November of 2004, and before, Defendant Clark assumed responsibility for the examination, care and treatment of Ann Billings.

21.     It became and was Defendant Clark's duty in caring for and treating Ann Billings to exercise due care and skill according to common and good practice of a competent, skilled, and reasonable PA; and, in particular to follow up on Ann Billings abnormal test results and that appropriate referrals be made to a specialist and/or cardiologist.

22.     It became and was Defendant Clark's duty in caring for and treating Ann Billings to exercise due care and skill according to common and good practice of a competent, skilled, and reasonable PA; and in particular to follow up on the abnormal test results being passed on to the specialist and the patient made aware of the abnormal tests and the need for additional work-up and treatment depending on the opinion of the consulting specialist/cardiologist.

23.     It became and was Defendant Clark's duty in caring for and treating Ann Billings to exercise due care and skill according to common and good practice of a competent, skilled, and reasonable PA; and in particular to insure that his supervising physician at Defendant Family Care was made aware of the abnormal test results and diagnosis of Ann Billings.

24.     It became and was Defendant Clark's duty in caring for and treating Ann Billings to exercise due care and skill according to common and good practice of a competent, skilled, and reasonable PA; in ordering additional testing due to the abnormal test results.

25.     It became and was Defendant Clark's duty in caring and treating Ann Billings to exercise due care and skill according to common and good practice of a competent, skilled, and reasonable PA; and, in particular to diagnose and treat the cause of her chest pain, hypertension and abnormal test results.

26.     Disregarding his duty and contrary to the common and good practice of a competent, skilled and reasonable PA, Defendant Clark and Defendant Family Care were guilty of one or more of the following negligent acts and omissions in Ann Billing's care:

a.   Failure to recognize the standard of care for a PA required that the abnormal test results were properly followed up;

b.   Failure to recognize the standard of care for a PA required that referrals be made to an appropriate specialist which in this case would have been a cardiologist;

c.   Failure to recognize the standard of care for a PA required that the abnormal test results should have been passed on to the specialist;

d.   Failure to recognize the standard of care for a PA required that the patient be made aware of the abnormal tests and the need for additional work-up and treatment;

e.   Failure to recognize the standard of care for a PA required that the supervising physician at Defendant Family Care should have been made aware of the abnormal test results;

f.   Failure to recognize the standard of care for a PA required further follow up and work up for chest pain as reported by the patient and the history of hypertension indicated the possibility of cardiac disease;

g.   Failure to recognize life threatening symptoms and test results;

h.   Failure to administer the proper medications;

I.   Otherwise failed to practice reasonably and prudently as PA in family practice.

27.   As a direct and proximate cause of one or more of the described negligent acts or omissions of Defendant Clark and Defendant Family Care, Ann Billings suffered the damages under the Michigan Wrongful Death Act as outlined below.

## COUNT II

## MUSKEGON FAMILY CARE, P.C.

28.	Plaintiff adopts by reference paragraphs 1 through 27 inclusive..

29.	Defendant Family Care holds itself out to the public and particularly Ann Billings as a family practice capable of treating patients for general family medicine, and having staff physicians and physicians assistants available to render care, and having physicians and other hospital staff available which are under the direction and control of the employees, ostensible agents, and servants of the Defendant Muskegon Family Care, P.C.

30.	Upon Ann Billings initial consultation and treatment with Defendant Family Care and all subsequent visits, and  relying upon the Defendant's representations and duties, it became and was the Defendant Family Care's duty by its agents, employees, and servants, including Defendant Clarke, to exercise due and proper care and caution while treating patient Ann Billings.

31.	Defendant Family Care's duty included the exercise of care and skill in the domestic professional service corporation of running a Family Care Center including the operation, supervision and selection of medical staff, employees, agents, and servants.

32.	Defendant Family Care's duty include complying with all local, state, and federal regulations, policies, and standards in the accreditation, operation, and procedures applicable to family care medical facilities.

33.	Defendant Family Care  is responsible for its staff operation, and including but not limited to doctors, physician assistants, nurses, technicians, and other personnel, and for the quality of care rendered in a hospital pursuant to Michigan law.

8

34.    Defendant Family Care, by its physicians, physician assistants, nursing staff, agents, employees and servants, in its care of patient Ann Billings on the dates described herein, violated its duties and obligations, negligently treated and cared for Ann Billings in one or more of the following negligent acts and omissions:

a.    Failure to recognize the standard of care for a family medicine practice/clinic required that the abnormal test results were properly followed up;

b.    Failure to recognize the standard of care for a family medicine practice/clinic required that referrals be made to an appropriate specialist which in this case would have been a cardiologist;

c.    Failure to recognize the standard of care for a family medicine practice/clinic required that the abnormal test results should have been passed on to the specialist;

d.    Failure to recognize the standard of care for a family medicine practice/clinic required that the patient be made aware of the abnormal tests and the need for additional work-up and treatment;

e.    Failure to recognize the standard of care for a family medicine practice/clinic required that the supervising physician should have been made aware of the abnormal test results by the PA;

f.    Failure to recognize the standard of care for a family medicine practice/clinic required further follow up and work up for chest pain as reported by the patient and the history of hypertension indicated the possibility of cardiac disease;

g.    Failure to recognize life threatening symptoms and test results;

h.    Failure to administer the proper medications;

9

i.      Otherwise failed to practice reasonably and prudently as family medicine practice/clinic specializing in family practice.

35.    Upon Ann Billing's first presentation to Defendant Family Care, relying upon the Defendant's representation and duties, it became and was the Defendant Family Care's direct duty to exercise due and proper care and treatment of Ann Billings.

36.    As a direct and proximate result of one or more described negligent acts or omissions of Defendant Family Care, Ann Billings suffered the damages under the Michigan Wrongful Death Act as described below.

## DAMAGES

37.    Plaintiff adopts by reference paragraphs 1 through 36 inclusive.

38.    As a direct and proximate result of these Defendants' negligent acts and omissions as described above, Plaintiff has suffered the loss of a close family member. Plaintiff claims all damages recoverable under the Michigan Wrongful Death Act including, but not limited to,

a.      Conscious pain and suffering endured by Ann Billings from the time she started experiencing the symptoms until the time of her death;

b.      Loss of future companionship, guidance and direction to her children and grandchildren;

c.      Loss of Ann Billing's household services;

d.      Loss of loving mother and loving daughter, and family member in companionship, comfort, and consortium;

e.      Loss of future life and family pleasures suffered by Ann Billings and her family;

f.      Economic losses;

g.      Medical expenses, funeral expenses and burial expenses; and

10

h.  All damages allowed under the Michigan Wrongful Death Act MCLA 600.2922, MSA 27A, 2922.

## DEMAND

Plaintiff asks damages against Defendants, jointly and severally, for the sums to which they may be found entitled by jury, substantially in excess of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS jurisdictional minimum of this Court, together with applicable costs, attorney's fees and interest.

Dated this ___ day of April, 2010

B. Elliot Grysen (P39997)
Counsel for Plaintiff
806 River Street
Spring Lake, MI 49456
(616) 847-2121

## DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys, requests a jury trial.

Dated this ___ day of April, 2010

B. Elliot Grysen (P39997)
Counsel for Plaintiff

11

## PLAINTIFFS' AFFIDAVIT OF MERIT UNDER MCL 600.2912(d)

I hereby certify that I have reviewed the Notice of Intent to File Claim, and all medical records supplied by Plaintiffs' attorney concerning the care of Ann Billings before her death on December 2, 2005.   I am in the full time active practice as a physician's assistant which includes the management of patients like Ann Billings, with similar symptoms and findings, who require care diagnosis and treatment in family practice centers by physician's assistants.   During the year proceeding November 2005, I was in full time Practice in Michigan. It is my opinion that this is a meritorious case because:

A.    THE APPLICABLE STANDARD OF CARE required those PAs working at Muskegon Family Care including William A. Clark, PA-C and Nicole Bradford, PA-C, to use reasonable and proper care in evaluating, diagnosing, and treating Ann Billings.   In particular, when Ann presented on October 4, 2005 to PA Clark, the diagnosis of hypertension was made and PA Clark ordered additional test studies including a holter monitor and an echocardiogram of the heart. These studies were subsequently completed about October 21, 2005.   As a result of these studies, the standard of care for a PA required that these abnormal test results were properly followed up, and referrals made to an appropriate specialist which in this case would have been a cardiologist. This testing should have been passed on to the specialist and the patient made aware of the abnormal tests and the need for additional work-up and treatment depending on the opinion of the consulting cardiologist. The supervising physician at Muskegon Family Care should also have been made aware. Additional testing should have been ordered dependant upon the opinion of the cardiologist and consultants. When the patient visited the office on November 8, 2005, the same plan should have been followed if it had not been done already.

**FILED**

MAY   4 2010

CIRCUIT COURT RECORDS

B.     THE APPLICABLE STANDARD OF CARE was breached in failing to perform as described in "A". Ann was sent home without proper referral to the appropriate specialist which would, in this case, have been a cardiologist. Chest pain as reported by this patient and the history of hypertension indicated the possibility of cardiac disease. Either of these could have been life threatening and probably treated successfully if appropriate referral had been made to a cardiologist who would have considered additional treatment within their area of practice. These violations would apply to any PA who was aware of the test results and any legal entity found to be responsible for these respected PAs.

C.     IN ORDER TO COMPLY WITH THE APPLICABLE STANDARD OF CARE, William A. Clark, PA, Nicole Bradford, PA-C, or any PA that became aware of the test results should have followed those practices outlined in "A" and "B" above. The applicable standard of care required the providers to recognize the potential for life threatening diseases suggested by the clinical presentation and take those steps described above. The standard of care would require referral to a cardiologist on an urgent basis and the transmission of the test results to that cardiologist, as well as a notification to the patient of these problems.

D.     THE BREACH OF THE APPLICABLE STANDARD OF CARE was a substantial and direct cause of the death of Ann Billings. I can find nothing in the record that was done to send Ann to a cardiologist, to make Ann aware of the diagnosis, or to start the treatment needed to avoid this death.

Dated: 1-21-2010

Raymond P. Mooney, PA-C

Subscribed to and sworn to before me

this 21 day of January , 2010.

Notary Public, Jackson Co.,
My commission expires: 3-22-2011

## PLAINTIFFS' AFFIDAVIT OF MERIT UNDER MCL 600.2912(d)

I hereby certify that I have reviewed the Notice of Intent to File Claim, and all medical records supplied by Plaintiffs' attorney concerning the care of Ann Billings before her death on December 2, 2005. I am board certified in the area of cardiovascular disease, which includes the management of patients like Ann Billings with similar symptoms and findings who require care, diagnosis and treatment by cardiologists. During the year proceeding November 2005, I was in full time practice in New York. It is my opinion that this is a meritorious case because:

THE BREACH OF THE APPLICABLE STANDARD OF CARE was a substantial and direct cause of the death of Ann Billings. I can find nothing in the record that was done to send Ann to a cardiologist, to make Ann aware of the diagnosis, or to start the treatment needed to avoid this death.

Based upon my education and experience, I believe that if Ann Billings had been referred to a cardiologist, she would have survived and had near normal life expectancy. Ann Billings should have been referred to and immediately treated by a cardiologist based on her abnormal Holter monitor readings, which showed multiple runs of ventricular tachycardia, and her echocardiogram which showed a reduced ejection fraction. She also exhibited a symptom of dizziness. This symptom, in combination with the readings, meant she needed immediate hospitalization and placement of an ICD (Implantable Cardioverter Defibrillator).

**FILED**

MAY   4 2010

CIRCUIT COURT RECORDS

Based upon her medical records, autopsy report, and the lack of coronary artery disease, her symptoms were probably based upon arrhythmias, which would have been treated by the above standard treatment with a high degree of certainty.

Further, based upon my education and experience and my review of the medical records, my opinion is that, more probable than not, the death of Ann Billings could have been avoided with near medical certainty.

Dated: _April 26th 2010_ _____

Bruce D. Charash, M.D.

Subscribed to and sworn to before me

this _26th_ day of _April_ , 2010.

_____

Notary Public, _Bronx_ Co.
My commission expires: _9/15/12_

Robert A Dellaero
Notary Public, State Of New York
No. 01DE6193531
Qualified In Bronx County
Commission Expires 9/15/12